The People of the State of Illinois, Defendant in Error,
v. Cyrus H. Drury, Plaintiff in Error, and Harry L.
Crawford.

Gen. No. 8,190.

548

Opinion filed July 2, 1928.

O. B. Dobbins and W. Thomas Coleman, for plaintiff in error.

Robert F. Cotton, State's Attorney, and Lott R. Herrick, for defendant in error.

Mr. Justice Eldredge delivered the opinion of the court.

The defendant, Cyrus H. Drury, and Harry L. Crawford were indicted by the grand jury of Douglas county for the crime of conspiracy at the October term, 1926, of the circuit court thereof. The plaintiff in error was granted a separate trial which resulted in a verdict of guilty, fixing his punishment at confinement in the penitentiary for three years and a fine of $2,000. After motions for a new trial and in arrest of judgment had been overruled he was sentenced to an indeterminate term in the penitentiary at Chester, and to pay a fine

of $2,000. The indictment under which he was tried consisted of five counts, the first of which charged:

"1. The Grand Jurors, Chosen selected and sworn in and for the County of Douglas, in the name and by the authority of the People of the State of Illinois, upon their oaths present: That Harry L. Crawford and Cyrus H. Drury, late of the County of Douglas in the State of Illinois, did, on to wit: the first day of March in the year of our Lord one thousand nine hundred and twenty-six, at and within the said County of Douglas in the State of Illinois, aforesaid, unlawfully, fraudulently, maliciously, wickedly and feloniously combine, conspire, confederate and agree together and with divers other persons whose names are to the Grand Jurors unknown, with the fraudulent and malicious intent to wrongfully, wickedly and unlawfully obtain from the Hindsboro State Bank, a Corporation, then and there duly organized and existing under and by virtue of the laws of the State of Illinois, *a large amount of money, property and credit,* of the value of to wit: Thirty-six thousand dollars, by means and by use of the confidence game, contrary to the Statute in such case made and provided, and against the peace and dignity of the same People of the State of Illinois."

The second, third and fourth counts are identically the same except that in the second the charge is a conspiracy to obtain money only, the third, to obtain property only, and the fourth to obtain credit only.

The fifth count charges a conspiracy to unlawfully obtain a large amount of funds, money and property from the Hindsboro State Bank by means of false pretenses, and, omitting the preliminary averments therein, is as follows:

"That Harry L. Crawford and Cyrus H. Drury, late of said County, on to wit: the first day of March, in the year of our Lord one thousand nine hundred and twenty-six, at and within the said County of Douglas, in the State of Illinois, aforesaid, did unlawfully,

fraudulently, maliciously, wickedly and wilfully, with felonious and malicious intent to wrongfully and wickedly obtain from the Hindsboro State Bank, a Corporation, then and there duly organized and existing under and by virtue of the laws of the State of Illinois, by means of false pretenses, did combine, conspire, confederate and agree together and with divers other persons whose names are to the Grand Jurors unknown, to wrongfully, wickedly and unlawfully obtain from the said Hindsboro State Bank, a Corporation, as aforesaid, a large amount of funds, money and property, to-wit: the funds, money and property then and there, of the value of Thirty-six Thousand Dollars then and there the property of the said Hindsboro State Bank, a Corporation, as aforesaid, by means of false pretenses, contrary to the Statute in such case made and provided, and against the peace and dignity of the same People of the State of Illinois.''

Hindsboro is a small village, having a population of four or five hundred people. The Hindsboro State Bank was organized in 1916 under the laws of the State of Illinois, and had a capital stock of $30,000. Of this stock Harry L. Crawford, codefendant, owned 58 shares, his father, John Crawford, 51 shares, and his brother, Elmer Crawford, 50 shares. Harry L. Crawford, at the time of the transactions involved in this case, was the cashier and had been such since the bank was organized in 1916. His father was president and his brother was vice president. Harry L. Crawford, together with his father and brother, under the partnership name of John Crawford & Sons, was also engaged in the lumber and grain business, though most of his attention was given to the Bank.

The plaintiff in error, Cyrus H. Drury, resided at Clifton, Arizona, and during the time in question was attempting to sell bonds of the Arizona Power & Water Company. Associated with him was a man by the name of A. B. Graham.

Corrigan Company was a corporation located at Grand Rapids, Michigan. Its general business was that of dealing in stocks and bonds. At the time the transactions in this case occurred it was attempting to float or finance a $1,000,000 bond issue of the Arizona Power & Water Company. Mr. Phil Corrigan was the president of the company and the active member thereof in the dealings with the parties involved in this suit.

Mr. J. Everett Davis, a cousin of Crawford, was president of the Farmer's and Merchant's Bank of Pesotum, Illinois, and also secretary and treasurer of the Arizona Power & Water Company.

The record in this case is very voluminous, consisting of about 800 pages, a large portion of which consists of documentary evidence of nearly 200 exhibits, comprising numerous checks, drafts, deposit slips, letters, telegrams and bank records. It would be impracticable in this opinion to mention all the transactions involved in the case, but it is clearly proven beyond any reasonable doubt that the result thereof was a loss to the Hindsboro State Bank of such an amount of money as to compel it to close its doors in April, 1926.

Plaintiff in error, Drury, did not testify on the trial, but his codefendant, Crawford, was one of the witnesses on his behalf and testified that he first met Drury in 1919 or 1920, but never had met him very often up to May, 1924, and had not known what his business was up to that time.

The commencement of the transactions between Drury and Crawford, as cashier of the Bank, began on May 19, 1924, when Drury appeared in the village of Hindsboro and through Crawford secured a loan from the Hindsboro State Bank for the sum of $1,400, without any security therefor. This money he deposited in the Bank, or was given credit therefor in a checking account. On the same day he checked out $800, and

within 10 days thereafter had checked out the entire balance and by June 3, 1924, had overdrawn his account to the amount of $500.

Drury's account with the Bank stood in this overdrawn condition until September, 1924, when A. B. Graham appeared in Hindsboro at the request of Drury and delivered to Crawford two checks drawn on the Hindsboro State Bank (hereafter designated as "the Bank") executed by Drury, each payable to the order of Corrigan Company, one bearing date September 19, 1924, for the sum of $2,565.50, and the other bearing date September 23, 1924, for the sum of $2,500. The aggregate amount of these two checks was $5,065.50. Graham testified that Drury instructed him to tell Crawford that he was not to cash these checks until he received other checks payable to Drury for a like amount. Within a day or two Crawford received two checks, each dated September 24, 1924, each payable to the order of Drury, one for the sum of $2,487.50, and the other for $2,578, drawn on the Grand Rapids Savings Bank, Grand Rapids, Michigan, and executed by Corrigan Company, the aggregate amount being also $5,065.50. Crawford credited Drury's account with the Bank with the amount of the Corrigan Company checks and then cashed Drury's checks. These Corrigan Company checks were cleared and paid by Corrigan Company, so the Bank lost nothing by this particular transaction. However, within a few days Crawford received from Drury two checks drawn on the Bank by Drury payable to Corrigan Company, dated September 24, 1924, one for the sum of $2,565.50 and the other for the sum of $2,500. At substantially the same time he also received two checks bearing date of September 29, 1924, drawn on the Grand Rapids Savings Bank, payable to the order of Drury, executed by Corrigan Company, one for the sum of $2,565.50, and the other for the sum of $2,500. Crawford credited Drury's account with the Bank to the amount of the Corrigan

Company checks and then cashed Drury's checks for a similar amount. On the next day Crawford received from Drury two checks drawn on the Bank each dated October 1, 1924, and each for the sum of $2,600, payable to the order of Corrigan Company and executed by Drury. At the same time he received two checks each dated September 30, 1924, each for the sum of $2,600, payable to the order of Drury drawn on the Grand Rapids Savings Bank, and executed by Corrigan Company. Crawford went through a similar procedure adopted in regard to the other checks and credited Drury's account with the amount of the Corrigan Company checks and then cashed Drury's checks for the same amount. The next day Crawford received two checks each dated October 1, 1924, drawn on the Grand Rapids Savings Bank, payable to Drury and executed by Corrigan Company, one for the sum of $5,000, and the other for $2,500. At the same time Crawford received from Drury two checks drawn on the Bank each executed by Drury, one dated September 30, for the sum of $2,500, and one dated September 31, for the sum of $5,000. These two checks instead of being payable to Corrigan Company were payable to Hudsonville State Bank. In the same manner Crawford credited the amount of the Corrigan Company checks to Drury's account and paid Drury's checks to the Hudsonville State Bank. The last six checks executed by Corrigan Company, amounting to $17,765.50, were never paid by Corrigan Company but went to protest and were returned to the Bank stamped, "Payment stopped." Why payment was stopped on these checks the evidence does not disclose. This particular species of fraud practiced in this case, as shown by the evidence, is known as "kiting checks."

On October 22, 1924, the auditor of public accounts wrote to Crawford as follows: "There seems to be some uneasiness in your community and in the neighboring communities relative to the operations of cer-

tain parties who are interested in the Arizona Power and Water Company with which one Cyrus H. Drury is connected. Kindly inform the Department whether or not Mr. Drury or his company or anyone connected with this company in an official capacity is indebted directly or indirectly to your bank.''

Crawford replied to this letter as follows:

''Regarding the Arizona Power and Water Company and C. H. Drury, neither of these are indebted to this bank at this time. We have carried an account with Mr. Drury for the past two years and a short time ago he mailed us some checks for deposit drawn by Corrigan Company. These checks went to protest. This matter hung fire for several days on account of Mr. Drury being in Arizona. During the past few days this matter has been entirely cleaned up, all the checks taken care of and neither Mr. Drury or this Company are directly or indirectly indebted to this bank.''

In addition to the above amount of $17,765.50, Drury had also succeeded in obtaining from the Bank, in some manner not disclosed, but shown by a charge in the books made by Crawford against his account, the sum of $4,500, on October 14, 1924. This amount and also Drury's original note to the Bank of $1,400, and his overdraft of $500, a total of $24,165.50, is shown to have been withdrawn from the Bank by Drury with Crawford's knowledge and assistance, at the time he wrote to the auditor that Drury was not indebted to the Bank. The letter from the auditor seems to have impressed Crawford with some realization of the situation he had placed the Bank in by his reckless transactions with Drury and Corrigan Company. On October 25, 1924, he wrote to Drury the following letter:

''I received a letter from the State Auditor last evening asking if C. G. Drury or anyone connected with the Arizona Power and Water Co. was in any way indebted to this Bank, this letter must be answered at

once, yet I can not inform them that these people owe me $12,765.00 and you $1900.00, that is far above our loan limit   *   *   *   and I can not hold this letter longer than Monday or Tuesday to make reply, it should go out of here Monday evening.

"They (meaning the Continental & Commercial Bank of Chicago, the correspondent of the Hindsboro State Bank at that time) are off of this Grand Rapids affair and don't mince any words in telling me so, one of their Cashiers called on me Wednesday of this week, they have a good line on this deal, the Cashier of the Grand Rapids Trust and Savings Bank was in to see the Cont. & Com. a few days ago and from him I judge they gleaned a good lot of information. Of course not knowing any of the details of your project, they look upon it with a critical eye, and can not understand how we, a small country bank in Illinois should get mixed with this affair in Grand Rapids   *   *   *.

"This has placed me in so bad that it is going to be necessary for me to get on the outside and raise some money to take care of things here, so just as soon as you get things squared away so that this stock can be used for collateral, I want you to let me know, for I must get busy."

From that time on Crawford seems to have made strenuous efforts to get Drury and Corrigan Company to pay back to the Bank the moneys received by them and there is some proof that at different times, and mostly by cash paid to Crawford by messenger from Drury, Crawford received from the latter different sums amounting in all to $7,500. Crawford, however, testified that when he received this cash from Drury he deposited it not to the credit of Drury's account in the Bank, but to the credit of his own account or to the account of John Crawford & Sons. He nowhere pointed out in the bank accounts of either himself or of John Crawford & Sons, any items showing the de-

posit of these sum of money, but testified that he could not remember in which accounts he deposited them. No documentary evidence was introduced by Drury evidencing any of these payments. Crawford had many subsequent interviews with Drury and Phil Corrigan in attempts to recover some of the moneys of the Bank. Finally, in December, 1924, he procured a lawyer through whose efforts the following contract was executed:

"Agreement and Assignment, Made this 26th day of December, 1924, by and between Hindsboro State Bank of Hindsboro, Illinois, and Charles B. Winslow of St. Joseph, Michigan, and C. H. Drury of Detroit, Michigan, Witnesseth:

"Whereas, the undersigned Hindsboro State Bank of Hindsboro, Illinois, is the holder of six (6) certain checks of Corrigan Company of Grand Rapids, Michigan, all drawn on the Grand Rapids Savings Bank of Grand Rapids, Michigan, payable to and endorsed by C. H. Drury and being of numbers, dates and amounts as follows:

No. 28457, dated September 29, 1924, for $2,565.50
No. 28456, dated September 29, 1924, for 2,500.00
No. 28453, dated September 30, 1924, for 2,600.00
No. 28482, dated September 30, 1924, for 2,600.00
No. 28486, dated October 1, 1924, for 5,000.00
No. 28485, dated October 1, 1924, for 2,500.00
and

"Whereas, all of said checks have been protested and there is now due thereon (after deducting a payment of Five Thousand [$5,000.00] Dollars made to said Hindsboro State Bank by said Corrigan Company on October 18, 1924) for principal, protest fees and interest, the amount of Twelve Thousand Nine Hundred Thirty-five Dollars and Forty-three Cents ($12,935.43) ; and

"Whereas, the undersigned holds as collateral against its said claim the following:

"Note of Corrigan Company, dated September 23, 1924, payable sixty days after date to the order of C. H. Drury in the amount of $2,500.00 collateraled by certificate No. 3 for 500 shares of the preferred stock of the Federal Warehouse Company, Ltd., issued to and endorsed by Corrigan Company;

"Note of Corrigan Company dated October 7, 1924, for $6,000.00, payable to the order of Hindsboro State Bank, and collateraled by two notes of J. W. Tiscornia of St. Joseph, Michigan, for $3,000.00 each, dated September 29, 1924, and payable sixty days and ninety days, respectively, after date; and

"Whereas, the undersigned Charles B. Winslow desires and offers to purchase from said Hindsboro State Bank its said claim against Corrigan Company on the terms and conditions hereinafter stipulated and for the sum of Eleven Thousand ($11,000.00) Dollars to be paid as follows: Five Thousand ($5,000.00) Dollars in cash; sixty-day note of J. W. Tiscornia of St. Joseph, Michigan, for Three Thousand ($3,000.00) Dollars, of even date herewith, payable to the order of C. H. Drury, with interest at the rate of six per cent (6%) per annum; ninety-day note of J. W. Tiscornia of St. Joseph, Michigan, for Three Thousand ($3,000.00) Dollars, under even date herewith, payable to the order of C. H. Drury, with interest at the rate of six per cent (6%) per annum; and

"Whereas, it is understood and agreed that in assigning its said claim said Hindsboro State Bank shall and does reserve all its rights and claims against said C. H. Drury on his endorsements of the checks in question and with respect to the balance of the said claim not covered by the cash payment of Five Thousand ($5,000.00) Dollars above mentioned.

"Now Therefore, in consideration of the premises, said Hindsboro State Bank hereby sells and assigns without recourse to said Charles B. Winslow its said claim against Corrigan Company, together with all of its right, title and interest in and to the collateral above enumerated; Provided, that said Bank hereby reserves all its rights and claims against said C. H. Drury on account of his endorsements of the checks hereinbefore mentioned and with respect to the balance of said Bank's claim which is not covered by the cash payment of Five Thousand ($5,000.00) Dollars hereby acknowledged. Said Hindsboro State Bank hereby acknowledges receipt from said Charles B. Winslow of the following:

"Five Thousand ($5,000.00) Dollars in cash; sixty-day note of J. W. Tiscornia under even date herewith in the amount of Three Thousand ($3,000.00) Dollars, payable to the order of C. H. Drury, with interest at the rate of six per cent (6%) per annum; ninety-day note of J. W. Tiscornia under even date herewith in the amount of Three Thousand ($3,000.00) Dollars, payable to the order of C. H. Drury, with interest at the rate of six per cent (6%) per annum.

"Said Charles B. Winslow hereby agrees to the reservations and conditions hereinbefore specified and hereby acknowledges receipt from said Hindsboro State Bank of the following:

"The six (6) Corrigan Company checks hereinbefore mentioned.

"Note of Corrigan Company, dated September 23, 1924, payable sixty days after date to the order of C. H. Drury in the amount of $2,500.00, collateraled by Certificate No. 3 for 500 shares of the preferred stock of the Federal Warehouse Company, Ltd., issued to and endorsed by Corrigan Company.

"Note of Corrigan Company dated October 7, 1924, for $6,000.00, payable to the order of Hindsboro State

Bank, and collateraled by two notes of J. W. Tiscornia, of St. Joseph, Michigan, for $3,000.00 each, dated September 29, 1924, and payable sixty days and ninety days, respectively, after date.

"I, the said C. H. Drury, hereby acknowledge that I am the endorser of the checks mentioned in this agreement and assignment, and hereby agree and consent to the terms and conditions hereof; I further hereby acknowledge receipt of the two notes of said J. W. Tiscornia dated this date and in the amount of Three Thousand ($3,000.00) Dollars each, and further acknowledge that said notes, although payable to me, are in fact the property of said Hindsboro State Bank; I further acknowledge that I am indebted to said Bank for the balance of its claim in the sum of One Thousand Nine Hundred Thirty-five Dollars and Forty-three Cents ($1,935.43), and I agree to settle and adjust my said obligations to said Bank accordingly.

> Hindsboro State Bank
> By Wicks, Fuller & Starr,
>   Its Attorneys,
> Charles B. Winslow (L. S.)
> C. H. Drury
> By Richard N. Armstrong,
>                 Attorney.''

J. W. Tiscornia mentioned in the contract was president of the Arizona Power & Water Company. The contract is set out in full as it tends to show some of the relations between Drury and Corrigan Company. None of the Tiscornia notes were paid. The $5,000 (less $500 paid for attorney's fees) paid to Crawford under the terms of this contract was credited to Drury's account. After the execution of the above contract Crawford continued, by correspondence and personal interviews, principally with Drury, in his efforts to recover some of the Bank's money, which resulted in nothing but unfulfilled promises.

With this condition of affairs existing and the Bank about ready to close its doors, between February 15, 1926, and March 22, 1926, Drury drew 24 checks on the Hindsboro State Bank, which were cashed at the Bank through Crawford, its cashier, totaling an amount of $5,223.39. Each of these checks was originally signed by Drury, but in each instance, when Crawford received the check, he erased Drury's name and signed his own, and they were all paid through Crawford's own personal account, which was largely overdrawn. Crawford claims that he never told Drury that he had done this. Drury's account with the bank had long since been closed. Practically every day for 25 days one or more of these 24 checks were presented to the Bank by Drury for payment. Drury knew when he signed them that he had no money in the Bank to his credit, had no checking account with the Bank and was indebted to the Bank in a very large sum of money. He further knew that the Bank was in a precarious condition and would be forced to go into the hands of a receiver at any time. Crawford also knew these facts and yet he cashed these checks. The fact that he struck out Drury's name, signed his own thereto and paid them ostensibly through his own personal account, does not mitigate the offense or the criminality of the action because he overdrew his own account and used the moneys of the bank in doing so. There can hardly be any explanation of these transactions except that he and Drury were attempting to make a last effort to obtain the small amount of funds still remaining in the Bank. The last three checks so cashed were paid April 5, 1926, the day before the receiver took possession of the Bank.

These checks are as follows:

February 15, 1926, $250.00, payable to cash.

February 17, 1926, $175.00, payable to cash.

February 17, 1926, $75.00, payable to W. C. Hogan.

February 19, 1926, $250.00, payable to W. C. Hogan.

February 19, 1926, $250.00, payable to cash.

February 22, 1926, $200.00, payable to cash.

February 24, 1926, $100.00, payable to W. C. Hogan.

February 25, 1926, $545.75, payable to Canadian Pacific Railway.

February 26, 1926, $200.00, payable to cash.

March 1, 1926, $300.00, payable to cash.

March 1, 1926, $120.00, pabable to H. T. Moss.

March 2, 1926, $250.00, payable to W. C. Hogan.

March 3, 1926, $100.00, payable to cash.

March 5, 1926, $500.00, payable to Greenlease Motor Car Co.

March 6, 1926, $250.00, payable to Frederick T. Martins.

March 6, 1926, $250.00, payable to cash.

March 9, 1926, $200.00, payable to cash.

March 13, 1926, $100.00, payable to S. Herman.

March 13, 1926, $150.00, payable to cash.

March 19, 1926, $250.00, payable to Frederick T. Martins.

March 19, 1926, $100.00, payable to cash.

March 20, 1926, $258.64, payable to cash.

March 22, 1926, $100.00, payable to cash.

March 22, 1926, $250,00, payable to cash.

While the above-mentioned checks were being drawn on the Bank by Drury and being paid by Crawford, in the manner mentioned, the following transactions transpired between the parties. On February 27, 1926, Drury executed 3 checks on the Valley Bank of Clifton, Arizona, each payable to the order of Crawford, one for the sum of $2,000, one for $1,000, and one for $750. Crawford credited the banking account of John Crawford & Sons with the $2,000 and $1,000 checks, and his own personal account in the Bank with the $750 check. On March 4, 1926, Drury executed two other checks drawn on the same Valley Bank and payable to the order of Crawford, one for the sum of

$1,000, and the other for the sum of $500, both of which Crawford deposited to his own credit in the Bank. All of the above-mentioned checks were protested for non-payment and returned stamped "N. S. F.," meaning "not sufficient funds." They were all used by Crawford to give false credit to the accounts of John Crawford & Sons and his own account with the Bank and were never checked back against the accounts.

A witness by the name of Hanley, who was connected with the Arizona Power & Water Company, testified that on February 15, 1926, Drury gave him $700, to deliver to Crawford and that he did so. Crawford's brother, Elmer, testified that Drury gave him $1,000 February 21, 1926, to deliver to Crawford and that he did so. Crawford himself testifies that Drury sent him $2,000 on March 23, 1926, by a man by the name of Lyons. He further testified that as he received these several cash payments he deposited the money to the credit of either his own personal account or to the account of John Crawford & Sons, he could not remember which. The bank records show no deposits of any such amounts on or near the dates mentioned nor any amounts approximating the same and it is not reasonable to believe that Drury sent these sums of money to Crawford, for, during that same period of time, as hereinabove shown, he was daily drawing checks on the Bank and had drawn out of the Bank, through Crawford's aid, over $5,000.

As stated before, the "kited" Corrigan Company checks were returned to Crawford or the Hindsboro State Bank marked, "Payment stopped" and there is no evidence showing why payments of these checks were stopped. No one had a right to stop the payment of the checks, if there were sufficient funds of Corrigan Company on deposit in the Grand Rapids Savings Bank when they were presented, except Corrigan Company itself. During the time that these checks were being "kited" by Drury, Corrigan Com-

pany and Crawford, and on and between the dates of September 27, 1924, and October 31, 1924, Drury was in the office of Corrigan Company and received from it at different times sums amounting to $2,350. The uncontradicted evidence shows that with the exception of two instances, when checks were delivered to Drury, the money was paid by Corrigan Company to Drury, in cash, in the following manner: On September 27, 1924, Phil Corrigan caused a check to be drawn on the Grand Rapids Savings Bank in the name of Corrigan Company, payable to Arthur F. Rensland, in the sum of $700. Rensland was an office boy employed by Corrigan Company and was directed by Corrigan to take the check to the Grand Rapids Savings Bank, draw the cash and return to the office with it. This was done and Corrigan gave the money to Drury. This procedure was repeated on September 30, for the amount of $100, October 2, for $400, October 13, for $50, October 16, for $100, October 18, for $600, except in this instance the check was made payable to Russell S. Williams, another employee in the office, October 29, for $150, and on October 31, two checks were executed by Corrigan Company, each for $125, drawn on the Grand Rapids Savings Bank, payable directly to the order of Drury. All of these last-named checks were introduced in evidence and conclusively show that at the time that the original Corrigan Company checks were protested and stamped "Payment stopped," Corrigan Company had funds deposited in the Grand Rapids Savings Bank and, of course, he must have also had, either in that bank or somewhere else, the $17,765.50, that Crawford had sent it. The uncontroverted facts in evidence contain all the elements to constitute the crime of conspiracy to unlawfully and fraudulently obtain the money of the Hindsboro State Bank by Drury, Phil Corrigan, Corrigan Company and Crawford. There is also evidence tending to connect A. B. Graham with the conspiracy. He was an asso-

ciate of Drury's and acted as the latter's messenger in the delivery of the first two Corrigan Company checks. J. Everett Davis was president of the Farmer's and Merchant's Bank of Pesotum, Illinois, and was secretary and treasurer of the Arizona Power & Water Company. He was also a cousin of Crawford's and Crawford testified that when the first Corrigan Company checks were presented to him he advised with him as to the financial responsibility of Corrigan Company and was assured by Davis that it had a high financial rating and that Crawford would be safe in cashing Corrigan Company's checks. He also promised Crawford that when the Arizona Power & Water Company was financed he would deposit $50,000 of that company's funds in the Hindsboro State Bank. The evidence also shows that Drury had promised Crawford that he would obtain for him a position with the United States Copper Mining Company, another proposition which Drury was also exploiting, at a salary of $10,000 per year. The credits given to Drury by the Bank through Crawford far exceeded the limit permitted by the Banking Act, Cahill's St. ch. 16a, ¶ 10, of this State, which Crawford well knew and in one of his letters to Drury calls the latter's attention to that fact. It can make no difference that Crawford may have had explicit faith in the honesty of Drury, or in the success of the project which he was exploiting, or that he was influenced by Drury's promise of a position with a salary of $10,000, or by the promise of Davis to deposit in his bank funds to the amount of $50,000. If he tacitly or otherwise agreed with Drury to unlawfully use the moneys of the Bank for any purpose whatever he was guilty of conspiracy as charged in the indictment. That he did so is beyond question, even up to the day before the Bank had to close its doors. The material facts in the case are conclusively proven and uncontroverted and upon

no theory of the case, in our opinion, can they be reconciled with that of the innocence of Drury.

It is first urged that the evidence shows that Crawford obtained the confidence of the Bank by virtue of his office as cashier and not by means of any scheme, trick or device, and therefore could not be guilty of unlawfully obtaining the money from the Bank by means of the confidence game; likewise, that he did not unlawfully obtain the money from the Bank by any false pretenses; that he, by reason of his office as cashier, had full control of the funds of the Bank and that all the transactions between himself and Drury were the usual and ordinary business transactions between a bank and a customer; that if Crawford could not be guilty of the crimé charged in the indictment, then, he being one of the only two named defendants, Drury could not be guilty. These contentions are fallacious for several reasons. The gist of the crime charged in the several counts of the indictment is a *conspiracy* to unlawfully obtain the funds of the Bank and not the crime of obtaining them by the confidence game or by false pretenses. The crime of conspiracy to do an unlawful act is a distinct and separate crime from that of doing the act itself.

In the case of *People v. Blumenberg,* 271 Ill. 180, it is held: "The essence of the offense is not the accomplishment of the unlawful object, but it is the unlawful combination or agreement to accomplish the criminal or unlawful purpose. It is unnecessary to prove any overt act toward the accomplishment of the unlawful purpose. The offense is complete when the agreement is made although no act is done toward carrying it into effect. The means to be employed to accomplish the unlawful purpose may never have been disclosed or may never have been agreed upon, so that they could not be stated, and yet the offense would be complete and might be proved by overt acts or other circumstances." To the same effect are *People v. Glassberg,*

326 Ill. 379; *Franklin Union No. 4 v. People,* 220 Ill. 355; 1 Russell on Crimes (8th Ed.) p. 151; 2 Wharton's Criminal Law (11th Ed.) p. 1739 *et seq.*

The means by which the unlawful act is to be accomplished need not be alleged or proven. *People v. Blumenberg, supra; Chicago, W. & V. Coal Co. v. People,* 214 Ill. 421; *Smith v. People,* 25 Ill. 17; 2 Wharton's Criminal Law, § 1608; 1 Russell on Crimes (8th Ed.) p. 186. A person may be convicted of conspiracy to commit a crime of which he could not, if he stood alone, be convicted. 1 Russell on Crimes (8th Ed.) p. 155; *United States v. Rabinowich,* 238 U. S. 78; *United States v. Holte,* 236 U. S. 140; *Aikens v. State,* 113 Wis. 419; *State ex rel. Durner v. Huegin,* 110 Wis. 189; *Solander v. People,* 2 Colo. 48; *State v. Crofford,* 133 Iowa 478.

"It is sufficient if any one of the parties to a conspiracy is legally capable of committing the offense, although the other parties may not have been." *Chadwick v. United States,* 141 Fed. 225.

Harrison in his work, Law of Conspiracy, page 160 states: "In a conspiracy to obtain property by false pretenses, these words are not to be construed in the technical sense in which they are used in indictments for obtaining by false pretenses—see R. V. Hudson (1860) Bell, 263."

If it be conceded that Crawford, if he had been indicted individually for either of the crimes of obtaining money from the Bank by means of the confidence game or by means of false pretenses, could not have been convicted on the grounds that any fraudulent acquirement of the funds of the Bank by him while acting as cashier would constitute the crime of embezzlement, no such limitation would extend to Drury, codefendant in the indictment, and Drury being capable of committing such crimes under the authorities cited, Crawford could be guilty of a conspiracy with Drury in the commission of the same.

There is another reason, however, why Drury cannot avail himself of this alleged defense. The indictment charges a conspiracy between Drury and Crawford *and other persons unknown.* The evidence unquestionably connects Corrigan Company, Phil Corrigan, Davis and Graham with the conspiracy.

In 2 Wharton's Criminal Law (11th Ed.) § 1656 it is stated: "It is in the discretion of the prosecution to include only as many of the alleged co-conspirators in the indictment as it may deem expedient; and the non-joinder of any such, provided there is enough alleged on the record to constitute the offense *aliunde,* is not matter for exception, although the party omitted was a *particeps criminis.* Nor is it necessary that a co-conspirator referred to, either specifically or as a person unknown, should be indicted." And the same author in section 1660 says: "An indictment charging the defendant with conspiracy with persons unknown is good, notwithstanding the names of some of the persons alleged unknown must necessarily have transpired to the grand jury."

And so in this State it was said in the case of *People v. Smith,* 239 Ill. 91: "We are satisfied the great weight of authority is to the effect that the persons engaged in a conspiracy are not so far a part of the offense as to be said to be descriptive of the offense, and the fact that a conspirator is designated in the indictment as unknown when he is known to the grand jury is not fatal to a conviction."

In so far as the evidence discloses, Phil Corrigan, Corrigan Company, Graham and Davis could be designated as parties unknown and there can be no reasonable doubt that the evidence would, at least, sustain such an indictment if the conspiracy had been charged against Drury and Phil Corrigan. It is also immaterial whether one or more of the co-conspirators received any pecuniary benefit out of the transaction. *Ochs v. People,* 124 Ill. 399. The existence of a con-

spiracy is generally a matter of inference deduced from the acts of the parties done in pursuance of a common criminal purpose. The evidence is generally circumstantial and it is not necessary to prove any actual agreement between the conspirators but such may be deduced from the facts proven.

"Every person concerned in any of the criminal parts of the transaction alleged as a conspiracy may be found guilty, so there is no evidence that such persons joined in concerting the plan or that they ever met the others, and so it is probable they never did, and though some of them only joined in the latter parts of the transaction, and probably do not know of the matter until some of the prior parts of the transaction were complete." 1 Russell on Crimes (8th Ed.) p. 190.

It is well settled that all persons shall be adjudged co-conspirators who may have helped to further or accomplish the conspiracy whether they originally were parties thereto or contributed their assistance at a later date.

Several objections have been made to the admission of evidence by counsel for plaintiff in error. In cases of this character a wide scope in the admission of evidence is permissible.

"Numerous objections to the admission and exclusion of evidence were made by counsel for plaintiff in error. In the admission of evidence in a conspiracy case much discretion is left to the trial court. The jury should have every fact that bears on the ultimate facts charged and that will assist them in coming to a conclusion as to such ultimate facts.   *   *   *   Evidence tending to show the relation of the parties, the purpose of the combination and the preliminary steps taken to effect that purpose is within the scope of the investigation to establish the conspiracy. The conspiracy once being shown, acts and conversations of one of the conspirators are admissible against all." *People v. Nall,* 242 Ill. 284.

In the case of *People v. Smith, supra,* it was held: "It is also urged that the court erred in ruling upon the evidence. While the court may have committed some technical errors in the course of the long trial had in this case in its rulings upon the admission or rejection of evidence, we are unable to say that any reversible error was committed."

The principal objection here urged is the alleged error of the court in admitting numerous letters and telegrams written and sent by Crawford to Drury. It appears by oral testimony that these were obtained by means of a search warrant issued by some court in Kansas City, Missouri. At this time Drury was in jail for some offense not shown. His trunk, in which the letters were contained, was held in an hotel pursuant to an innkeeper's lien for the nonpayment of an hotel bill. By virtue of the search warrant the trunk was opened, the letters and telegrams complained of were taken therefrom and in due course delivered to the State's attorney prosecuting this case. It is contended in a general statement, that they were procured in violation of the constitutions of the State of Illinois and of the United States. It is not pointed out what portions of the respective constitutions were violated nor in what way they were violated. Counsel for Drury claim that neither Drury nor himself knew that these letters and telegrams were in the possession of the State's attorney until they were offered in evidence and had no opportunity before the trial to make a motion to suppress them. These letters and telegrams were procured through some legal process under the laws of the State of Missouri. The right to the aid of search warrants existed under the common law. 2 Hale Pleas of the Crown, 149; *Miller v. Hogeboom,* 56 Neb. 434; *Meek v. Pierce,* 19 Wis. 300; 3 Parker Cr. Rep. (N. Y.) 656; 35 Cyc. 1266 *et seq.* In the absence of any proof to the contrary, the common law is presumed to prevail in the State of Missouri. *Forsyth v.*

*Barnes,* 228 Ill. 326; *Scholten v. Barber,* 217 Ill. 148. The fact that these telegrams and letters were in the possession of the State's attorney at the time they were offered raises the presumption that such possession was lawful, and such presumption will obtain until the contrary is shown by competent proof. The letters and telegrams in and of themselves were competent evidence, as the acts and conversations of one of the conspirators are admissible against all.

"The evidence showing the conversations with Samuels the day he was deposed as cashier and the day after comes within these rules. The letters to Samuels from the cashier of a bank in East St. Louis warning him of the worthlessness of certain drafts and checks passing through his bank previous to the time he was deposed, and found with his correspondence, tended to prove his knowledge, motive and intent, and we are disposed to hold the letters admissible for that purpose." *People v. Nall, supra.*

"So, after evidence had been given of a treasonable conspiracy in which the prisoner was concerned it was held that papers found in the lodging of a co-conspirator at a period subsequent to the apprehension of the prisoner might be read in evidence upon strong presumptive proof being given that the lodgings had not been entered by anyone in the interval between the apprehension of the prisoner and the finding of the papers, although no absolute proof had been given of their existence previous to the prisoner's apprehension." 1 Russell on Crimes (8th Ed.) 190.

The evidence in this case shows that the trunk was locked and had to be opened with a key. This is presumptive proof that it had not been previously opened. If their possession was obtained by such unlawful means as would make them incompetent, the burden was on defendant to prove that fact.

Crawford testified that one Lyons gave him $2,000 to deposit to the credit of Drury on the 23rd day of

March, 1926. Lyons was not produced by plaintiff in error as a witness but he offered a witness, Galbraith, who was interested with Drury in the Arizona Power & Water Company, who testified that Lyons, at the time of the trial, was in a hospital at Mattoon, Illinois. He also introduced the evidence of Crawford's brother, Elmer, who testified that Lyons was then in French Lick, Indiana. The People then introduced proof by the witness Redden that Lyons was, in fact, in Oakland, Illinois, at his home, a distance of about 25 miles form Tuscola, where the case was being tried. It is urged that it was error to permit Redden to give this testimony and the case of *People v. Munday*, 280 Ill. 32, is cited in support of this contention. That case held that no duty devolved upon one accused of crime to call anyone as a witness; that it was his privilege to produce witnesses and to make a defense or not, as he chose. The court further held: "To say that it was the duty of plaintiff in error, under the law, to produce witnesses who were equally accessible to the State and who were supposed to be in possession of facts having a bearing on the truth or falsity of the charge against him would be placing a burden upon him that the law does not require or tolerate." Such undoubtedly is the rule, but, under the circumstances, as they appear here, it is not applicable. Drury elected not to testify, which he had a legal right to do, nor was he bound by any duty to produce any witness, but when he attempted to prove that he didn't produce the witness Lyons because he was unable to do so on account of the fact that the witness was out of the jurisdiction of the court or was unable to be present on account of sickness, we can see no reason why the People could not rebut such testimony by showing that those facts were untrue. It is further urged that the letters which passed between the State auditor and Crawford, heretofore mentioned, should not have been admitted as against Drury. For the reason hereto-

fore stated that the acts and declarations of one conspirator are evidence against all of them, they were admissible.

It is also claimed that the prosecution for the crime charged in the indictment was barred by the statute of limitations for the reason that conspiracy is a misdemeanor and that the last overt act that could be considered as a part of such conspiracy was the transaction in regard to the last protested Corrigan Company check which occurred in October, 1924, and the indictment in this case was not returned until December 8, 1926, more than 18 months after the crime, if any, had been committed. Conspiracy, both at common law and under the statutes of this State, is a misdemeanor. "In the absence of any contrary statute, conspiracy is a misdemeanor, even where its object is the commission of a felony." 2 Bishop on Criminal Law § 240.

In the case of *People v. Blumenberg, supra,* it is held: "Although, as has been stated, the unlawful combination alone constitutes the offense of conspiracy and no act in furtherance of the unlawful design is necessary to complete the offense, yet every such act is regarded, in law, as a renewal or continuance of the unlawful agreement. (*People v. Mather,* 4 Wend. 229; *Bloomer v. State,* 48 Md. 521; *McKee v. State,* 111 Ind. 378; *Rex v. Brisac,* 4 East. 164.) A conspiracy once formed is presumed to exist whenever and wherever one of the conspirators does some act in pursance of its purpose. We have held that the performance of an overt act continues the existence of a conspiracy so as to prevent the running of the Statute of Limitations. (*Ochs v. People, supra, Cooke v. People,* 231 Ill. 9.) Since each overt act is a renewal of the conspiracy, the offense is continuous so long as overt acts in furtherance of its purpose are done. The conspiracy is renewed as to all the conspirators at the place where the

overt act is done, and it is not necessary to allege the exact place where the conspiracy was originally formed.'' The last overt acts between Drury and Crawford evidencing the conspiracy were on March 22, 1926, when Drury executed two checks, one for $100, and the other for $250, payable to the order of ''cash'' which were paid by Crawford out of the moneys of the Bank. The statute of limitations does not bar the prosecution in this case.

Counsel for the People, in his argument before the jury, stated that Crawford, in his testimony, perjured himself. There was sufficient evidence in the proof to lay a foundation for this statement and while a prosecuting attorney should not unnecessarily abuse a witness in his argument and should not go beyond the limits of propriety in his criticism, still he has a right, in an orderly manner, to give his opinion of the credibility of a witness. What was said by the prosecutor in this instance was not error.

Plaintiff in error made a motion in the trial court for a change of venue from Douglas county which was overruled. The granting of such a motion lies largely in the discretion of the court. The motion, however, was not preserved by a bill of exceptions, and cannot be considered.

Some errors, however, did occur on the trial. Crawford testified that Davis paid to the bank on behalf of Drury $5,000. Davis was not produced as a witness by plaintiff in error. One of the prosecuting attorneys commented on this fact in his argument to the jury. It was error to do this. *People v. Munday, supra.*

The fourteenth instruction given on behalf of the People is as follows: ''The Court further instructs the jury that the rule requiring a jury to be satisfied of the guilt of a defendant from the evidence beyond a reasonable doubt in order to warrant a conviction does not require that a jury should be satisfied beyond a

reasonable doubt of each link in the chain of circumstances, if any, relied upon to establish a defendant's guilt. It is sufficient, if taking the testimony all together, a jury is satisfied beyond a reasonable doubt that a defendant is guilty. The reasonable doubt that a jury is permitted to entertain must be as to the guilt of a defendant on the whole of the evidence and not as to any particular fact in the case." Substantially the same instruction was criticised and held erroneous in the case of *People v. Prall,* 314 Ill. 518, 524; *People v. Mooney,* 303 Ill. 469, 475, and *People v. Johnson,* 317 Ill. 430, 435. Instruction 19 given on behalf of the People sets out a section of the statute *in haec verba,* which has no application whatever to the facts in this case. It is a section governing conspiracies of officers and executive committees of societies, organizations and corporations for the purpose of establishing boycotts or black lists, etc. This instruction is so foreign to any of the issues in the case that the only reasonable explanation of why it should be offered or given is that it must have been done through inadvertence. We do not believe the jury, however, could have been misled in any way by this instruction because it could not be connected or applied in any way to the case. Criticisms have been made to other instructions which we deem without merit.

Finally it is contended that the verdict is void because it fixed the punishment. The same question was raised in the case of *People v. Tananevicz,* 285 Ill. 376. The court, in passing upon the same, said: "The rule is well settled in this State, however, that such portion of the verdict of a jury as lies beyond the legitimate province of the jury may be treated as surplusage and disregarded or rejected, where to do so would still leave a complete and valid verdict. (*People v. Coleman,* 251 Ill. 497; *Neathery v. People,* 227 id. 110; *Henderson v. People,* 165 id. 607.) Disregarding that portion of the verdict in this case fixing the term of im-

prisonment the verdict as to punishment is complete and is therefore not open to objections raised by plaintiff in error.'' The judgment of sentence is not questioned and the verdict is sufficient.

We are of the opinion that the errors indicated could not have changed the result of the verdict nor are they so grave and serious as to justify a reversal of the judgment. It was held in the case of *People v. Lloyd,* 304 Ill. 23, that the purpose of a reviewing court is not to determine whether the record is perfect but to determine whether the accused has had a fair trial under the law, and a judgment of conviction will not be reversed if it is based on competent evidence establishing guilt beyond a reasonable doubt, even though harmless errors were committed in the admission or rejection of evidence and in the giving and refusing of instructions. And to the same effect is the case of *People v. Scimeni,* 316 Ill. 591.

The evidence in this case, most of which is undisputed, so clearly shows the guilt of the plaintiff in error, beyond any reasonable doubt, that, in our opinion, the judgment should be affirmed regardless of the errors mentioned.

*Judgment affirmed.*